This Opinion is a
Precedent of the TTAB

Mailed: August 12, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Keystone Consolidated Industries, Inc.*
*v.*
*The Franklin Investment Corp. DBA Franklin Industries*

————

Cancellation No. 92066927

————

Jon O. Nelson, Banner & Witcoff Ltd. for
  Keystone Consolidated Industries, Inc.

Cecilia R. Dickson, The Webb Law Firm for
  The Franklin Investment Corp. DBA Franklin Industries.

————

Before Zervas, Greenbaum and Goodman,
  Administrative Trademark Judges.

Opinion by Goodman, Administrative Trademark Judge:

The Franklin Investment Corp., DBA Franklin Industries ("Respondent"), owns a

registration on the Supplemental Register for the following mark                     for

"Metal fence posts" in International Class 6 ("Red, White and Blue Fence Post Mark"). The registration contains a color claim: "The color(s) blue, white and red is/are claimed as a feature of the mark" and the following description of the mark: "The mark consists of a metal fence post with a blue bottom, white middle, and red top. The broken lines indicate the outline of the goods, which is not claimed as a part of the mark."[1]

Keystone Consolidated Industries, Inc. ("Petitioner") seeks cancellation of Respondent's Red, White and Blue Fence Post Mark on the ground of likelihood of confusion, Section 2(d), 15. U.S.C. § 1052(d). Petitioner has pleaded ownership of the

color mark  for "metallic fence posts"[2] in International Class 6 ("Red Top Fence Post Mark"). Petitioner's registration contains the following description:

---

[1] Registration No. 4329586 issued April 30, 2013.

[2] Registration No. 125561 issued May 27, 1919; renewed. A printout from the USPTO's Trademark Status and Document Retrieval (TSDR) database accompanied the petition to cancel showing active status and Petitioner's ownership thereof.

.

"[the] mark consists in coloring a short portion of the upper end of the post red." Additionally, the following matter is disclaimed: "no claim being made to the presentation of the post."[3] Petitioner also alleges prior use of a "mark consisting of coloring a short portion of the upper end of a fence post red" for "metallic fence posts and related products."[4]

Respondent filed an answer denying the salient allegations in the petition to cancel and asserting the affirmative defenses of laches and acquiescence.[5] Respondent also filed a counterclaim asserting a claim of abandonment and a claim for partial cancellation under Section 18 to narrow Petitioner's red color claim to

---

[3] "There was no statutory authority for disclaimer prior to 1946," and the USPTO's disclaimer practice fluctuated based on "various court decisions" until the Supreme Court's decision *Estate of P.D. Beckwith, Inc. v. Comm'r of Pats.*, 252 U.S. 538 (1920). TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1213.01 (May 2024). One of the early practices was requiring, as the USPTO did here, "a statement in the application disclaiming the unregistrable matter in the mark." *Id.*

[4] Petition to cancel, paragraph 6, 1 TTABVUE.

Citations to the record reference TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number, and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

As part of an internal Board pilot citation program, the citation form in this opinion is in a form provided in the TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") 101.03 (2024). This opinion cites decisions of the U.S. Court of Appeals for the Federal Circuit and the U.S. Court of Customs and Patent Appeals only by the page(s) on which they appear in the Federal Reporter (e.g., F.2d, F.3d, or F.4th). For decisions of the Board, this opinion employs citation to the LEXIS database. Practitioners should adhere to the citation forms set forth in TBMP § 101.03.

[5] Respondent also included an amplification of its denial of likelihood of confusion as a "defense," and a reservation of rights to assert further affirmative defenses, neither of which is an affirmative defense. *Made in Nature, LLC v. Pharmavite LLC*, Opp. No. 91223352, 2022 TTAB LEXIS 251, at *3-4 (TTAB 2022) (reservation of rights to add affirmative defenses is improper under the federal rules because it does not give fair notice of the affirmative defense); *Shenzhen IVPS Tech. Co. Ltd. v. Fancy Pants Prods., LLC*, Opp. No. 91263919, 2022 TTAB LEXIS 383, at *3 n.5 (TTAB 2022) ("amplifications [of denials] are not true affirmative defenses").

"burgundy red."[6] Lastly, Respondent sought to amend the description of its color claim for the color red to "candy apple red."[7] The Board noted the post-registration request to amend the description of the color claim in Respondent's registration was filed without the required declaration or fee and deferred consideration of the request to amend until final decision.[8]

As Petitioner points out, Respondent's brief did not raise an acquiescence defense, argue the claims alleged in the counterclaim, or address the post-registration amendment to the description of the color claim.[9] Therefore, we deem the acquiescence defense, Respondent's counterclaim, and its post-registration request to amend its registration's description of the color claim impliedly waived.[10] *See Harry Winston, Inc. v. Bruce Winston Gem Corp.*, Opp. No. 91153147, 2014 TTAB LEXIS 284, at *4-5 (TTAB 2014) (pleaded affirmative defenses not pursued in the brief

---

[6] 22 TTABVUE. A Section 18 claim, if successful, would have modified the description of Petitioner's mark lined for the color "red" to the specific shade of red actually used in the marketplace. *Covidien LP v. Masimo Corp.*, Can. No. 92057336, 2014 TTAB LEXIS 31, at *9 (TTAB 2014); *see generally In re Cook Med. Techs. LLC*, Ser. No. 77882876, 2012 TTAB LEXIS 496, at *26-29 (TTAB 2012).

[7] 22 TTABVUE.

[8] 21, 24 TTABVUE.

[9] Petitioner has argued that both pleaded affirmative defenses, laches and acquiescence, are waived. We do not deem the laches defense waived because Respondent addresses laches in its brief.

[10] We note the admonition of our primary reviewing court regarding the distinction between waiver and forfeiture. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)). Affirmative defenses that were asserted in an answer but then not pursued at trial may be deemed impliedly waived, while affirmative defenses that were never asserted may be deemed forfeited. *See JNF LLC v. Harwood Int'l Inc.*, 2022 TTAB LEXIS 328, at *4 n.8 (TTAB 2022) (finding asserted defenses not pursued either waived or forfeited).

considered waived); *Corporacion Habanos S.A. v. Guantanamera Cigars Co.*, Opp. No. 91152248, 2008 TTAB LEXIS 13, at *2 n.2 (TTAB 2008) (descriptiveness claim waived because not discussed in brief); *G. B. Kent & Sons, Ltd. v. Colonial Chem. Corp.*, Can. No. 92009419, 1969 TTAB LEXIS 225, at *2 n.1 (TTAB 1969) (counterclaim not addressed in the brief deemed waived).

Each party filed a trial brief and Petitioner filed a reply brief.[11]

## I.    Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the involved registration.

In addition, Petitioner submitted a notice of reliance (75-76 TTABVUE). Petitioner also submitted the declaration testimony of Dain Rakestraw, Manager, Marketing & Customer Service, for Liberty Steel & Wire – Red Brand Fence[12] with exhibits (70 TTABVUE (confidential declaration testimony of Mr. Rakestraw filed at 71 TTABVUE)); and the declaration testimony of Timothy Dillon, Senior Vice President Sales and Marketing for Liberty Steel USA,[13] with exhibits, (72 TTABVUE (confidential declaration testimony of Mr. Dillon filed at 73 TTABVUE)).

---

[11] Petitioner's brief is at 82 TTABVUE and its reply brief is at 86 TTABVUE; Respondent's brief is at 84 TTABVUE.

[12] "Liberty Steel acquired Keystone Consolidated Industries in July 2019." Rakestraw declaration, paragraph 2, 70 TTABVUE 5; Dillon declaration, paragraph 2, 72 TTABVUE 5.

[13] Petitioner's witnesses have not explained the difference between Liberty Steel and Wire – Red Brand Fence and Liberty Steel USA who are mentioned as the employers of Mr. Rakestraw and Mr. Dillon, respectively. Rakestraw declaration, paragraph 1, 70 TTABVUE 5; Dillon declaration, paragraph 1, 72 TTABVUE 5.

Petitioner also provided the testimony declaration of expert Jonathan Flombaum, PhD., Associate Professor in the Department of Psychological and Brain Sciences in the Krieger School of Arts & Sciences at Johns Hopkins University (74 TTABVUE).[14] Professor Flombaum's testimony relates generally to color constancy, color perception, memory of color, and color as applied to natural and manmade objects, with specific testimony in relation to the color red. [15]

Respondent submitted a notice of reliance (80 TTABVUE (confidential filings for the notice of reliance at 81 TTABVUE)). Respondent also submitted the testimony declaration of Nathan Kovalchick, Chief Executive Officer of Franklin Industries, with exhibits, (78 TTABVUE (confidential declaration testimony of Mr. Kovalchick filed at 79 TTABVUE)).

---

[14] A witness presented as an expert must demonstrate on the record that he or she is qualified to offer opinion testimony "by knowledge, skill, experience, training, or education...." Fed. R. Evid. 702. We find that Professor Flombaum's specific research and teaching qualifies him as an expert in the assessment of human vision, color perception, and visual memory of color for purposes of this proceeding. *See ProMark Brands Inc. v. GFA Brands, Inc.*, Opp. No. 91194974, 2015 TTAB LEXIS 67, at *50 (TTAB 2015) (finding expert witnesses qualified).

Respondent has not disputed Professor Flombaum's status as an expert on these issues.

[15] Professor Flombaum's testimony is relevant to the visual appearance and commercial impression of the color red claimed as a mark or a portion of a mark which is not limited to any particular shade of red. Professor Flombaum also provided his opinion on likelihood of confusion of the parties' marks based on the color red. We note that although an opinion of an asserted expert may have some probative value, it is not dispositive on the ultimate determination of likelihood of confusion. *See, e.g.*, *Anheuser-Busch, Inc. v. Holt*, Opp. No. 91180119, 2009 TTAB LEXIS 599, at *16-17 & 23 (TTAB 2009) (opinion of an expert in linguistics may have some probative value; "credible expert testimony ... is no substitute for evidence of how the purchasing public perceives a term ... in reaching the ultimate conclusion on the issue of mere descriptiveness.").

## II.   Background of Petitioner's Pleaded Registration

Petitioner's pleaded Registration No. 125561 issued under the Trade-Mark Act of 1905,[16] which retained the common law definition of a trademark. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 171 (1995); *see also Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1074 n.5 (Fed. Cir. 2022) quoting J. Thomas McCarthy, 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:32 ("[R]egistration under the federal act of 1905, for purposes of territorial protection, did not confer any greater rights than exist at common law, under the TEA ROSE-Rectanus doctrine. However, the 1946 federal Lanham Act changed all this."); *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1245 (8th Cir. 1994) ("Before passage of the Lanham Act in 1946, federal trademark law did not confer greater rights than existed at common law.");*W. Stove Co. v. Geo. D. Roper Corp.*, 82 F. Supp. 206, 216 (S.D. Cal. 1949) (discussing trademark rights under the common law, the Trade-mark Act of 1905, and the Lanham Act); *Philco Corp. v. Phillips Mfg. Co.,* 133 F.2d 663, 669 (7th Cir. 1943) (discussing substantive rights under the Trade-Mark Act of 1905); *In re Dixie Ins. Co.*, Ser. No. 73282622, 1984 TTAB LEXIS 65, at *5 (TTAB 1984) ("However, the registrability standard established by the Trademark Act of 1946 represents a clear departure from the common law.").

---

[16] Trade-Mark Act of 1905, ch. 592, 33 Stat. 724, repealed by Lanham Act, ch. 540, § 46(a), 60 Stat. 427, 444 (1946) ("all Acts and parts of Acts inconsistent herewith are hereby repealed … insofar as they are inconsistent herewith."). https://govtrackus.s3.amazonaws.com/legislink/pdf/stat/60/STATUTE-60-Pg427.pdf; https://www.govinfo.gov/content/pkg/USCODE-2022-title15/pdf/USCODE-2022-title15-chap22-subchapI-sec1051.pdf.

The Supreme Court, "[i]n interpreting the Trademark Acts of 1881 and 1905," (which retained the common law definition of a trademark), "questioned '[w]hether mere color can constitute a valid trade-mark,' *A. Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co.*, 201 U. S. 166, 171 (1906), and suggested that the 'product including the coloring matter is free to all who make it, *Coca-Cola Co. v. Koke Co. of America*, 254 U. S. 143, 147 (1920).'" *Qualitex Co.*, 514 U.S. at 171. In addition, at that time, under the common law, trade dress such as the use of color on a product required a showing of acquired distinctiveness (or secondary meaning).[17] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 786 (1992) (Thomas, J., concurring). ("Trade dress, which consists not of words or symbols, but of a product's packaging (or 'image,' more broadly), seems at common law to have been thought incapable ever of being inherently distinctive."); *see also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:10 (5th ed. 2024 update) ("The old rule—All trade dress required proof of a secondary meaning (prior to Taco Cabana)").

"The proper time for measuring inherent distinctiveness is at the time of registration." *In re Chippendales USA Inc.*, 622 F.3d 1346, 1354 (Fed. Cir. 2010).

---

[17] "[A] mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 211 (2000) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). "[A]cquired distinctiveness ([is] also commonly referred to as secondary meaning." *Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, Opp. No. 91085234, 1992 TTAB LEXIS 40, at *4 (TTAB 1992); *see, e.g.*, *In re Chamber of Commerce of United States*, 675 F.3d 1297, 1300 (Fed. Cir. 2012) (referring to secondary meaning also as acquired distinctiveness).

Petitioner submitted into the record the prosecution history of the underlying application which matured into the pleaded color mark registration. During successful appeal of the refusal to register the color mark, Petitioner (as applicant) made statements as to the distinctiveness in trade (acquired distinctiveness/secondary meaning) of its Red Top Fence Post Mark due to public association; we find these statements equivalent to a Section 2(f) statement in an ex parte application and a statement against interest as to the distinctiveness of its color mark at the time. *See Sunbeam Corp. v. Battle Creek Equip. Co.*, Opp. No. 91063070, 1982 TTAB LEXIS 199, at *3 (TTAB 1982) (applicant's claim of distinctiveness in its application is an admission by applicant that term is descriptive); *see also Lia Jene Inc. v. Vitabath, Inc.*, Can. No. 92009027, 1969 TTAB LEXIS 103, at *6 (TTAB 1969) ("certain statements made by a party in an ex parte proceeding may, under particular circumstances, be considered to be admissions against interest in a subsequent inter partes proceeding").

On July 6, 1948, Petitioner's pleaded registration, Registration No. 125561, was republished under Section 12(c) of the Trademark Act, 15 U.S.C. § 1062(c) (Publication).[18] The act of republication allowed Petitioner to claim the benefits of the provisions of the Trademark Act as though registered on the Principal Register except as limited under sections 8, 12, 14 and 15 of the Trademark Act.[19]

---

[18] *See* Petitioner's notice of reliance, 75 TTABVUE 71, 76-83 and the Rakestraw declaration, Exhibits A-05 and A-06, 70 TTABVUE 51-60.

[19] https://www.govinfo.gov/content/pkg/USCODE-2023-title15/html/USCODE-2023-title15.htm. *See* Section 46(b) of the Trademark Act, 15 U.S.C. § 1051, Statutory Notes, Pending Proceedings and Existing Registrations and Rights Under Prior Acts, which provides that registrations "now existing under … the Act of February 20, 1905, shall

Although Petitioner's Red Top Fence Post Mark is entitled to the benefits of the Principal Register, Petitioner's product color mark cannot be inherently distinctive because the Supreme Court has held that as a matter of law, color marks applied to the product itself are not inherently distinctive. *Wal-Mart Stores Inc.*, 529 U.S. at 206; *Qualitex Co.* 514 U.S. at 162-163; *see also In re Integra Biosciences Corp.*, Ser. No. 87484450, 2022 TTAB LEXIS 17, at *16 (TTAB 2022) ("Color can sometimes be inherently distinctive on product packaging, but it can never be inherently distinctive on a product itself.") (citing *In re Forney Indus.*, 955 F.3d 940, 946-947 (Fed. Cir. 2020)); TMEP § 1202.05(a).

III.    Unpleaded Registrations

Petitioner submitted by notice of reliance six unpleaded registrations: four red color marks applied to wire fencing, barbed wire, wire fence panels, and wire fence stays, and two "Red Brand" word marks for wire fencing, wire fence posts, and wire stockade panels to show "history and use of its marks" and "for priority and likelihood of confusion purposes."[20] Petitioner also has relied on these unpleaded registrations in its brief but does not assert that the petition to cancel should be amended under Fed. R. Civ. P. 15(b) to plead these registrations.

---

continue in full force and effect for the unexpired terms thereof and may be renewed under the provisions of section 9 of this Act. Such registrations and the renewals thereof shall be subject to and shall be entitled to the benefits of the provisions of this Act to the same extent and with the same force and effect as though registered on the principal register established by this Act except as limited in sections 8, 12, 14, and 15 of this Act." Sections 8, 12, 14 and 15 have no bearing on the issues presented herein.

[20] Petitioner's notice of reliance, Exhibits 3-5, 75 TTABVUE 223-887; Rakestraw declaration, paragraph 7, 70 TTABVUE 7-9.

Although Respondent did not object in its brief to Petitioner's reliance on the six unpleaded registrations, it did not affirmatively treat them as being of record either. We find the unpleaded registrations have not been tried by implied consent of the parties such that we can treat the pleadings amended to assert the registrations under Fed. R. Civ. P. 15(b). *See Harry Winston, Inc.*, 2014 TTAB LEXIS 284, at *9 n.14. We give no further consideration to the six unpleaded registrations.

Therefore, we only have considered Petitioner's witness testimony and evidence in the context of Petitioner's "history and use" of offering fencing products, featuring the color red as a mark, and offering fencing products under the unpleaded "Red Brand" word mark, discussed *infra*.

## IV. Entitlement to a Statutory Cause of Action

In every inter partes case, the plaintiff must establish its statutory entitlement to bring an opposition or cancellation proceeding. To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) proximate causation. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1304-05 (Fed. Cir. 2020). Demonstrating a real interest in cancelling registration of a mark satisfies the zone-of-interests requirement, and demonstrating a reasonable belief in damage by the maintenance of a mark demonstrates damage proximately caused by registration of the mark. *Id*. at 1306.

As noted at the beginning of this opinion, Petitioner has properly made its pleaded registration of record by submitting a copy from the USPTO's TSDR electronic database, contemporaneous with the filing of the petition to cancel, and under its

notice of reliance.[21] Trademark Rule 2.122(d)(1)-(d)(2), 37 C.F.R. §§ 2.122(d)(1)-(d)(2). The pleaded registration establishes Petitioner's direct commercial interest and Petitioner's real interest in the proceeding and its reasonable belief in likely damage, establishing its entitlement to petition to cancel Respondent's registration.[22] *See Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1161 (Fed. Cir. 2002) (direct commercial interest satisfies "real interest test") (citation omitted); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) (pleaded registrations "suffice to establish …direct commercial interest" and entitlement; a belief in likely damage can be shown by establishing a direct commercial interest) (citations omitted); *Monster Energy Co. v. Lo*, Opp. No. 91225050, 2023 TTAB LEXIS 14, at *15 (TTAB 2023) (pleaded registrations establish entitlement to oppose on the ground of likelihood of confusion); *Shenzhen IVPS Tech. Co.*, 2022 TTAB LEXIS 383, at *20 (valid and subsisting pleaded registration establishes opposer's direct commercial interest and real interest in the proceeding and its reasonable belief in damage) (citation omitted).

## V. Laches Affirmative Defense

The elements of a laches defense are: (1) unreasonable delay in assertion of one's rights against another; and (2) material prejudice to the latter attributable to the delay. *Lincoln Logs Ltd. v. Lincoln Pre-Cut Logs Homes Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992). Respondent, as the party raising the affirmative defense, has the burden

---

[21] 1 TTABVUE; 75 TTABVUE 13-23.

[22] Respondent did not address Petitioner's entitlement in its brief.

of proving it. *See Bridgestone/Firestone Rsch. Inc. v. Automobile Club de l'Quest de la France*, 245 F.3d 1359, 1361 (Fed. Cir. 2001).

To determine whether Petitioner has unreasonably delayed in bringing this cancellation proceeding, we begin by ascertaining the date Petitioner first had knowledge that the involved Supplemental Registration issued. *See TPI Holdings,* Can. No. 92064976, 2018 TTAB LEXIS 121, at *17 (TTAB 2018) ("[I]n the context of a laches defense asserted in a cancellation proceeding involving a Supplemental registration and in calculating the amount of any unreasonable delay, we calculate notice by determining the date when the petitioner first had knowledge that the registration issued."). In this case, the involved Supplemental Registration issued on April 30, 2013 and the parties identify dates in 2012 and 2017 for purposes of arguing Petitioner's knowledge of Respondent's Supplemental Registration.

Respondent's witness and CEO, Nathan Kovalchick, recounts that Respondent received a cease and desist letter in September 2012 from Chicago Heights Steel, a company Respondent asserts is in privity[23] with Petitioner.[24] Mr. Kovalchick states that after the September 2012 letter, Respondent heard nothing from Petitioner itself

---

[23] "In trademarks, the concept of privity generally includes, inter alia, the relationship of successive owners of a mark (e.g., assignor and assignee, or survivor of a merger) and the relationship shared by 'related companies' within the meaning of Sections 5 and 45 of the Trademark Act, 15 U.S.C. §§ 1055 and 1127." *Warren Distrib., Inc. v. Royal Purple, LLC*, Opp. No. 91214792, 2015 TTAB LEXIS 243, at *3-4 (TTAB 2015).

[24] Mr. Kovalchick responded to this letter stating "Chicago Heights is not the record owner of the registration that you mentioned. In the event that Chicago Heights is the record owner, then please provide proof of same." Kovalchick declaration, Exhibit 4, 78 TTABVUE 23. Petitioner points out that "the September 2012 letter that Franklin mentions also predates Franklin's Supplemental Registration which did not issue until April 30, 2013." Petitioner's reply brief, 86 TTABVUE 21 n.5.

(Keystone Consolidated Industries, Inc.) until May 2017,[25] roughly five years after it received the cease and desist letter from Chicago Heights Steel.[26]

Petitioner argues that "Franklin's interactions with a third party [Chicago Heights Steel] are not relevant."[27] Petitioner asserts that there was no unreasonable delay, as it filed the petition to cancel "two months" after learning of Respondent's registration.[28]

We find that Respondent has not proven that Petitioner knew about Respondent's Supplemental Registration earlier than the May 30, 2017 letter of Petitioner's outside counsel. The Chicago Heights Steel cease and desist letter sent to Respondent in September 2012 occurred before Respondent's Supplemental Registration issued on April 30, 2013. Since we find that Respondent has not established that Petitioner knew of Respondent's registration before May 30, 2017, the filing of the petition to cancel in September 2017, a little more than three months later, is an insufficient

---

[25] The record shows that On May 30, 2017, Petitioner's outside counsel wrote to Respondent on behalf of Petitioner Keystone Consolidated Industries, Inc. Kovalchick declaration, Exhibit 5, 78 TTABVUE 26. Both the Chicago Heights Steel 2012 communication and the Keystone Consolidated Industries Inc. 2017 communication were cease and desist letters that asked Respondent to cease and desist from selling the Red, White and Blue Fence Post Mark, and claiming Petitioner's Registration No. 125561 was being infringed. Attached to Keystone Consolidated Industries Inc.'s 2017 correspondence was a 1999 copy of the registration certificate, showing Keystone Consolidated Industries, Inc. as owner.

[26] Kovalchick declaration, paragraphs 12, 14-20, 78 TTABVUE 9-10.

[27] Petitioner's reply brief, 86 TTABVUE 21.

[28] Petitioner's reply brief, 86 TTABVUE 21. Petitioner references Exhibit 6 of the Kovalchick declaration which consists of a June 12, 2017 email communication with letter attachment from Respondent's counsel writing on behalf of Respondent. Kovalchick declaration, Exhibit 6, 78 TTABVUE 35.

period to be considered undue or unreasonable delay for laches to apply. We find Respondent has failed to prove undue delay for purposes of its laches defense.

For the sake of completeness, we will determine whether Respondent showed prejudice resulting from Petitioner's delay.

To meet its burden of proving that laches bars Petitioner's likelihood of confusion claim, Respondent also must establish that it suffered harm as a result of the delay, which here Respondent asserts as economic prejudice.[29] *See Bridgestone/Firestone Rsch.*, 245 F.3d at 1362; *Schiedmayer Celesta GmbH v. Piano Factory Grp., Inc.*, Can. No. 92061215, 2019 TTAB LEXIS 334, at \*32 (TTAB 2019) (citations omitted), *aff'd*, 11 F.4th 1363 (Fed. Cir. 2021) (citations omitted). Economic "[p]rejudice is generally shown by the fact that in reliance on petitioner's silence, respondent built up a valuable business and goodwill around the mark during the time petitioner never objected." *Kemi Organics, LLC v. Gupta*, Can. No. 92065613, 2018 TTAB LEXIS 149, at \*41 (TTAB 2018) (quoting *Turner v. Hops Grill & Bar Inc.*, Can. No. 92026674, 1999 TTAB LEXIS 416, at \*7 (TTAB 1999)); *see also Bridgestone/Firestone Rsch.*, 245 F.3d at 1362 ("economic prejudice [is] based on loss of time or money or foregone opportunity").

Respondent's witness Mr. Kovalchick refers to Respondent's use of the Red, White and Blue Fence Post mark from 2012 through the filing of the petition to cancel, and its witness confidentially provides its total unit and dollar sales during the period

---

[29] Prejudice can also be in the form of evidentiary prejudice which is "prejudice at trial due to loss of evidence or memory of witnesses." *Bridgestone/Firestone Rsch.*, 245 F.3d at 1362.

"from 2014 through the present."[30] Based on this testimony, Respondent argues in its brief that it has shown during this period – the delay period – it made "significant inroads in the industry" and "substantial sales" and continued to invest in its Red, White and Blue Fence Post Mark.[31]

However, the relevant period of delay is the approximately three-month period between May 30, 2017 through September 22, 2017. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995) (the relevant period for purposes of economic prejudice is the delay period); *see, e.g.*, *TPI Holdings,* 2018 TTAB LEXIS 121*, at *17-18 (considering economic prejudice during the period of unreasonable delay of over four years). There is no competent evidence in the record about advertising expenditures during the relevant May-September period,[32] and there is

---

[30] Kovalchick declaration, paragraphs 11-12, 78 TTABVUE 9.

[31] Respondent's brief, 84 TTABVUE 12, 25-26 (referencing among other things, the Kovalchick declaration, paragraphs 11-12, 78 TTABVUE 9). The parties are treating Respondent's advertising and sales figures as confidential; however, Petitioner did not file Respondent's interrogatory responses under seal or file redacted copies. The Board has treated these responses as confidential for the present, but because it is the general policy of the Board that all papers in a proceeding be public, at the end of this opinion, Petitioner will be allowed time in which to submit a notice of reliance with a redacted version of this exhibit, failing which, the exhibit will be treated as part of the public record.

[32] "Except as otherwise provided, and wherever applicable and appropriate, procedure and practice in inter partes proceedings shall be governed by the Federal Rules of Civil Procedure." Trademark Rule 2.116(a), 37 C.F.R. § 2.116(a). Respondent's interrogatory responses as to promotional expenditures provided under Petitioner's notice of reliance are not verified or sworn; they are only signed by counsel. "[U]nsigned and unverified answers to interrogatories do not qualify as answers under Fed. R. Civ. P. 33" and "unverified answers to interrogatories are not competent evidence." *Daniel J. Quirk, Inc. v. Village Car Co.*, Can. No. 92057667, 2016 TTAB LEXIS 474, at *19 n.28 (TTAB 2016) (citing *Cabales v. U.S.*, 51 F.R.D. 498, 499 (S.D.N.Y. 1970), *aff'd*, 447 F.2d 1358 (2d Cir. 1971)). But even if we were able to consider the response as competent evidence, this information is extremely limited, referencing only two examples of expenditures, with one expenditure prior to registration of the Red, White and Blue Fence Post mark. We also note that Petitioner's responses to

no testimony from Mr. Kovalchick regarding Respondent's promotional efforts or other efforts to build goodwill in its Red, White and Blue Fence Post Mark during this period. In the absence of such testimony and evidence, it is impossible to assess the economic prejudice, if any, suffered by Respondent during the relatively brief period of delay. *See Bridgestone/Firestone Rsch.*, 245 F.3d at 1363 ("Economic prejudice arises from investment in and development of the trademark and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice."); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir.1999) ("[i]f only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice require[d] before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required."). *Compare Alfacell Corp. v. Anticancer, Inc.*, Can. No. 92032202, 2004 TTAB LEXIS 441, at *23 (TTAB 2004) (evidence of economic prejudice insufficiently specific because "it is difficult to gauge, in the absence of dollar amounts or other specific information relative to its promotional efforts, the degree to which there has been any detriment") *with Ava Ruha Corp. v. Mother's Nutritional Ctr., Inc.*, Can. No. 92056067, 2015 TTAB LEXIS 10, at *27-29 (TTAB 2015) (economic prejudice found based on a showing of tens of millions of dollars spent growing the business, adding at least 15 stores, and spending over $7 million promoting its marks during the three year and two month period of delay).

---

interrogatories submitted under Respondent's notice of reliance are similarly unsworn by Petitioner and only signed by counsel.

We find Respondent has not sufficiently shown that it suffered economic prejudice for laches to apply.

Accordingly, Respondent's laches defense falls not just for failing to show undue delay but also for failing to show prejudice resulting therefrom.

## VI. Priority

Priority may arise from "a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights." *See Herbko Int'l,* 308 F.3d at 1162. Petitioner must prove priority by a preponderance of the evidence.

### A. Priority where Petitioner owns a Principal Registration and Respondent Owns a Supplemental Registration

In a cancellation proceeding where a petitioner owns a Principal Register registration (or can claim the benefits of a Principal Register registration, as is the case here) and respondent owns a Supplemental Registration, the Section 7(b) presumptions apply only to petitioner;[33] therefore, a petitioner is entitled to rely on its pleaded Principal Register registration for purposes of priority without having to establish a prior use date either by relying on its application filing date or proving an

---

[33] A registration on the Supplemental Register is not entitled to any statutory presumptions under Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), and is incompetent as evidence of use. *See* Trademark Act Section 26, 15 U.S.C. § 1094; *In re Bush Bros. & Co.*, 884 F.2d 569, 570 n. 2 (Fed. Cir. 1989). A registrant owning a registration on the Supplemental Register also is not entitled to a constructive use date as of the application filing date. Trademark Act Section 7, 15 U.S.C. § 1057.

earlier use date.[34] *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1402 (CCPA 1974).[35]

Accordingly, because Petitioner's pleaded registration is of record such that Petitioner can claim the benefits of a Principal Register registration, and because Respondent has waived its counterclaims directed to Petitioner's pleaded registration and owns a Supplemental Register registration, Petitioner's priority has been established for the goods identified in its pleaded registration.

---

[34] Respondent did not address priority in its brief.

[35] In contrast, in a cancellation proceeding where both parties own Principal Register marks, the Section 7(b) presumptions apply to both marks and the parties stand on equal footing. Under such circumstances, "the doctrine of *King Candy Company v. Eunice King's Kitchen, Inc.*, is not applicable … and … insofar as prior rights are concerned, [it] will be the party who can prove priority of use rather than mere priority of registration." *SCOA Indus., Inc. v. Kennedy & Cohen, Inc.*, 1975 TTAB LEXIS 117, at *6 (TTAB 1975) (proceeding number unavailable); *see also Brewski Beer Co. v. Brewski Bros. Inc.*, Can. No. 92021735, 1998 TTAB LEXIS 116, at *9-10 (TTAB 1998) (in a cancellation proceeding against a Principal Register registration where petitioner also owns a Principal Register registration, petitioner must establish prior rights but can rely on its application filing date for priority purposes). A plaintiff also must prove priority in a cancellation proceeding or in an opposition where a counterclaim has been asserted against the plaintiff's pleaded registration. *Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 1403 n.6 (CCPA 1974). As indicated, Respondent waived its counterclaims to cancel Petitioner's pleaded registration.

B. Petitioner's Prior Use of the "Red Top Fence Post Mark" and "Color Red" for Related Fence Post Products[36]

As noted earlier, Petitioner also alleged in the petition to cancel prior use of the Red Top Fence Post Mark and provided testimony and evidence regarding same.[37] Because we find priority based on Petitioner's pleaded registration for its Red Top Fence Post Mark, we need not separately consider Petitioner's common law rights in the Red Top Fence Post Mark. *See Nkanginieme v. Appleton*, Opp. No. 91256464, 2023 TTAB LEXIS 64, at *4-5 (TTAB 2023) (Board did not need to consider common law priority because it found it sufficient to rely on the pleaded registration in analyzing likelihood of confusion); *Itel Corp. v. Ainslie*, Opp. No. 91072956, 1988 TTAB LEXIS

---

[36] Petitioner appears to argue in its brief recognition by consumers of a group of "Red Top" fence product color marks (which include types of fencing and fence posts) and commercial strength (fame) based on their combined use. To the extent that Petitioner is attempting to rely on and argue ownership of a family of "Red Top" color marks, and commercial strength of the "Red Top" color mark family (in addition to its arguments directed to commercial strength of its Red Top Fence Post Mark alone, *see, e.g.*, *McDonald's Corp. v. McSweet, LLC*, Opp. No. 91178758, 2014 TTAB LEXIS 351, at *13 & 19 (TTAB 2014) (family of marks claim considered based on fame of the MC family of marks and also considering "the fame of the mark MCDONALD'S because the 'MC' family was derived from and points back to the mark and as such is integrally related to that mark")), a family of marks is unpleaded in the petition to cancel. Therefore, we need not consider the family of marks issue. *Wise F&I, LLC v. Allstate Ins. Co.*, Opp. No. 91226028, 2016 TTAB LEXIS 473, at *12 (TTAB 2016) ("A plaintiff must plead ownership of a family of marks in its complaint in order to rely on the marks as a family as a basis for sustaining the opposition at trial or in a motion for summary judgment."). We do however, consider Petitioner's history and use of fencing with a red top in connection with our discussion of the mark's commercial strength, *see infra.*

We further note that (i) a family of marks requires establishing common law priority of the family, in this case, priority based on acquired distinctiveness of the color red as applied to Petitioner's fence products, *see discussion supra* regarding the lack of inherent distinctiveness of color marks, which Petitioner has not done; and (ii) Petitioner's ownership of a "Red Top" family of color marks was not tried by express or implied consent. In addition, Petitioner does not plead ownership of a "Red Top" word mark used in conjunction with its Red Top Fence Post Mark as part of a family of marks.

[37] Petition to cancel paragraph 6, 1 TTABVUE.

79, at *3 (TTAB 1988) ("[B]ecause of the existence of opposer's valid and subsisting registration, it need not prove prior use as to the services recited therein.").

Petitioner also alleged in the petition to cancel prior use of the color red on products related to metallic fence posts.[38] Petitioner's witness Dain Rakestraw provided very limited testimony and evidence regarding agricultural fence products that prominently feature the color red, namely, "the top wire strand of fencing" and "individual bars in barbed wire [fence] products."[39]

However, we need not consider whether Petitioner has established a proprietary interest in use of the color red as applied to other fence products (i.e., fencing—"the top wire strand of fencing" and "individual bars in barbed wire") because Petitioner's pleaded registration for metallic fence posts, for which we have found priority, is closest to Respondent's goods.[40] *See Sock It To Me, Inc. v. Fan*, Opp. No. 91230554, 2020 TTAB LEXIS 201, at *20-21 (TTAB 2020) (confining 2(d) analysis to most

---

[38] Petition to cancel paragraph 6, 1 TTABVUE.

[39] Rakestraw declaration, paragraphs 2, 3, 4, 5 and 7, 70 TTABVUE 5-7. Dillon declaration, paragraph 5, 72 TTABVUE 6.

[40] In any event, because color marks are not inherently distinctive as applied to products, *see discussion supra*, Petitioner's priority claim depends on establishing that the color marks had acquired distinctiveness, which is a heavy burden. *See Owens-Corning*, 774 F.2d 1116, 1127 (Fed. Cir. 1985) ("By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character."). Such evidence is lacking in this record, where Mr. Rakestraw and Mr. Dillon did not provide a date by which the color marks applied to wire fencing acquired distinctiveness nor sales figures for its wire fencing products (barbed wire or wire fencing), provided only combined advertising figures for "Red Brand Products" as a whole rather than for wire fence products separately, and relied mainly on Petitioner's long use. Rakestraw declaration, paragraphs 4-5, 13-14, 16, 70 TTABVUE 6, 12, 13 (combined advertising for all fence products featuring the color red; long use); Dillon declaration, 72 TTABVUE (solely discussing fence post product sales and not providing any other sales data for wire fence products).

similar pleaded mark); *Fiserv, Inc. v. Elec. Transaction Sys. Corp.*, Opp. No. 91214266, 2015 TTAB LEXIS 29, at *10 (TTAB 2015); *In re Max Cap. Grp., Ltd.*, Ser. No. 77186166, 2010 TTAB LEXIS 1, at *4-5 (TTAB 2010). Accordingly, we consider likelihood of confusion only based on Petitioner's pleaded registration for the Red Top Fence Post Mark.

## VII.     Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) ("*DuPont* factors"). Petitioner must establish that there is a likelihood of confusion by a preponderance of the evidence. *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed. Cir. 1989) (citing cases involving likelihood of confusion).

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We discuss the *DuPont* factors for which there is relevant argument and evidence. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 1379-80 (Fed. Cir. 2019) (the Board considers each *DuPont* factor for which there is evidence and argument).

"Not all *DuPont* factors are relevant in each case, and the weight afforded to each factor depends on the circumstances. … Any single factor may control a particular case." *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 998 (Fed. Cir. 2020) (citing *In re Dixie Rests., Inc.,* 105 F.3d 1405, 1406-07 (Fed. Cir. 1997)).

    A.  Similarity or Dissimilarity of the Parties' Goods

The second *DuPont* factor considers "the similarity or dissimilarity and nature of the goods or services as described in an application or registration." *DuPont*, 476 F.2d at 1361. We analyze the second *DuPont* factor "on the basis of the identification of goods or services set forth in defendant's involved registration vis-à-vis the identification of goods or services in plaintiff's registration." *Mattel, Inc. v. Funline Merch. Co.*, Can. No. 92040128, 2006 TTAB LEXIS 478, at *6 (TTAB 2006) (citing *Octocom Sys., Inc. v. Houston Comput. Servs. Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990); and *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1493 (Fed. Cir. 1987)).

Respondent's goods are "Metal fence posts" and Petitioner's goods are "metallic fence posts." The goods are identical.

The second *DuPont* factor weighs in favor of a finding of likelihood of confusion.

    B.  Similarity or Dissimilarity of the Parties' Trade Channels, Classes of Consumers, and Conditions of Sale

The third *DuPont* factor considers "the similarity or dissimilarity of established, likely-to-continue trade channels," while the fourth *DuPont* factor considers the "conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful,

sophisticated purchasing." *DuPont*, 476 F.2d at 1361. In analyzing the third and fourth *Dupont* factors, just as we do with the second *DuPont* factor, we look to the identification of goods in Petitioner's pleaded registration and the identification of goods in Respondent's involved registration. *Stone Lion Cap. Partners v. Lion Cap. LLP*, 746 F.3d 1317, 1323 (Fed. Cir. 2014) (quoting *Octocom Sys.,* 918 F.2d at 942); *Sock It To Me*, 2020 TTAB LEXIS 201, at \*24 ("our decision, [under the fourth *Dupont* factor] however, must be based on the identification of goods in the pleaded Registration and subject [registration] as that determines the scope of the benefit of registration.") (citations omitted).

Because the goods described in Petitioner's and Respondent's registrations are identical, we presume that the channels of trade and classes of purchasers for those goods are the same. *In re Optica Int'l*, 1977 TTAB LEXIS 119, at \*6-7 (TTAB 1977)[41] (applying presumption of identical trade channels for identical goods in connection with an application seeking registration on Principal Register where the cited registration issued on the Supplemental Register) (citations omitted); *see also In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012) (identical goods are presumed to travel in same channels of trade to same class of purchasers). [42]

We find, at a minimum, the channels of trade and classes of purchasers are the same and this weighs in favor of a finding of likelihood of confusion.

---

[41] Serial number unavailable.

[42] Respondent does not address this *DuPont* factor in its brief.

As to conditions of sale under the fourth *DuPont* factor, Respondent argues that fence posts are meant to be permanent structures and are not an impulse purchase because purchasers use the fence posts primarily for farm land where it is important to keep farm animals from straying.[43] Petitioner submits that Respondent's assertions that purchasers of their fence posts are sophisticated should be given little weight and that the least sophisticated purchasers of fence posts should be considered.[44]

The purchasers of the parties' fence posts are those seeking to build or repair a fence. Respondent's witness Mr. Kovalchick states that its fence product is for property owners "for their farms, gardens or other properties."[45] Petitioner's witnesses have identified its "metallic fence posts" as an agricultural fence product,[46] and one of the advertisements provided by Petitioner's witness Mr. Rakestraw (most without specific testimony discussing them) states on its face: "being prepared is essential when planning a fence installation … several factors need to be considered."[47] Petitioner's website excerpts, also provided by Mr. Rakestraw as

---

[43] Respondent's brief, 84 TTABVUE 21 (referencing Respondent's unsworn supplemental response to interrogatories 6 and 42, Petitioner's notice of reliance, 75 TTABUVE).

[44] Petitioner's reply brief, 86 TTABVUE 16. Petitioner argues that Respondent's interrogatory responses do not support a finding of sophisticated purchasers. We find little weight can be given to Respondent's statement because it is conclusory, and the interrogatory response referenced is not competent evidence as Respondent's interrogatory responses are unsworn. *See supra* n.32 regarding unsworn interrogatories.

[45] Kovalchick declaration, paragraph 5, 78 TTABVUE 6.

[46] Petitioner alleged in the petition to cancel that "Petitioner is a leader in the agricultural fencing industry." Petition to cancel paragraph 1, 1 TTABVUE.

[47] Rakestraw declaration, paragraph 11, Exhibit A-08, 70 TTABVUE 11, 67.

exhibits, show on their face a fence calculator for "how much you'll need" and "estimated budget."[48] A blogpost provided under notice of reliance at blog.redbrand.com asks "which fence is right for you?" and states: "Talk to your dealer today for more information which material is best for your farm."[49] A Facebook post provided by Petitioner under notice of reliance states:

> WHAT ARE YOU FENCING IN? Red Brand offers a variety of spacing, heights and wire gauges for various applications. Consider how much animal pressure will be present; the higher the number of animals, the more stress the fence will incur. In addition, fences near a barn or feeding area will sustain more pressure than other regions.[50]

We find that buying metal fence posts which, based on the record, are generally used for agricultural properties, would not be an impulse purchase. However, because there is no specific testimony in the record about purchasing conditions, pricing, and all types of purchasers who would purchase such metallic or metal fence post products,[51] we find the sophistication of purchasers neutral in the *DuPont* analysis. *See, e.g., Double Coin Holdings Ltd. v. Tru Dev.*, Can. No. 92063808, 2019 TTAB LEXIS 347, at *25-26 (TTAB 2019) (finding the fourth *Dupont* factor neutral because even if the parties' goods are not subject to impulse buying, there was a lack of

---

[48] Rakestraw declaration, paragraph 11, and Exhibit A-08, 70 TTABVUE 11, 68.

[49] Petitioner's notice of reliance Exhibit D-17, 76 TTABVUE 13-14.

[50] Petitioner's notice of reliance Exhibit D-19, 76 TTABVUE 114.

[51] Petitioner's social media pages do evidence some pricing information for its wire fencing products, but absent specific witness testimony, this information is hearsay. *See WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, Opp. No. 91221553, 2018 TTAB LEXIS 72, at *18-19 (TTAB 2018) (factual assertions on webpages were hearsay because they were not supported by any statement from a competent witness).

evidence in the record showing "consumers will exercise a higher than ordinary degree of purchasing care").

### C. Strength of the Mark

We now turn our consideration to the strength of Petitioner's mark under the fifth and sixth *Dupont* factors in order to evaluate the scope of protection to which Petitioner is entitled. *DuPont*, 476 F.2d at 1361. *See Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1362 (Fed. Cir. 2023) ("Two of the *DuPont* factors (the fifth and sixth) consider strength."). The fifth *DuPont* factor enables Petitioner to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use);" the sixth *DuPont* factor allows Respondent to contract that scope of protection by adducing evidence of "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 476 F.2d at 1361.

In determining the strength of a mark, we consider both inherent strength, based on the nature of the mark itself, and if there is probative evidence in the record, its commercial strength or fame, based on marketplace recognition of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d at 1353-54 ("A mark's strength is measured both by its conceptual strength … and its marketplace strength"); *Top Tobacco, L.P. v. North Atl. Operating Co., Inc.*, Opp. No. 91157248, 2011 TTAB LEXIS 367, at *25 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength). We also consider, if there is evidence in the record,

whether the mark has commercial weakness in the marketplace. *DuPont*, 476 F.2d at 1361.

### 1. Conceptual Strength[52]

Considering the conceptual strength of Petitioner's mark, we evaluate its intrinsic nature, which here is a single-color mark applied to portion of a fence post. As previously discussed, marks consisting of color applied to a product or a portion of a product as a matter of law are not inherently distinctive and can only be registered upon a showing of acquired distinctiveness (or secondary meaning). *Wal-Mart Stores,* 529 U.S. at 211-212 (citing *Qualitex Co.*, 514 U.S. at 162-163 explaining that "a product's color is unlike 'fanciful,' 'arbitrary,' or 'suggestive' words or designs, which almost *automatically* tell a customer that they refer to a brand").

Because color marks applied to products or portions of products such as Petitioner's Red Top Fence Post Mark are not generally distinctive, (and can never be inherently distinctive either under common law, under pre-Lanham Trade-mark Acts, or under the Lanham Act), we find that Petitioner's mark is inherently weak. *See Wal-Mart Stores,* 529 U.S. at 213 ("In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist"; consumers are aware that product features such as color or shape are "intended not to identify the source, but to render the product itself more useful or

---

[52] Petitioner did not address conceptual strength. *See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, Opp. No. 91223982, 2020 TTAB LEXIS 269, at \*52 (TTAB 2020) (although plaintiff did not address conceptual strength of its BROOKLYN marks, the Board found the BROOKLYN marks conceptually and inherently weak), *aff'd in part, rev'd in part*, 17 F.4th 129 (Fed. Cir. 2021).

more appealing"). In view of the foregoing, Petitioner's single-color mark applied to a portion of its product is not a conceptually strong mark.

### 2. Fame or Commercial Strength

We now consider Petitioner's testimony and evidence of commercial strength or fame of the Red Top Fence Post Mark.

"Fame for purposes of likelihood of confusion is a matter of degree that 'varies along a spectrum from very strong to very weak.'" *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1367 (Fed. Cir. 2012) (citations omitted). Fame for likelihood of confusion purposes may be measured indirectly by, for example, "the volume of sales and advertising expenditures of the goods sold under the mark" "and other factors such as length of time of use of the mark; wide-spread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services." *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, Opp. No. 91199352, 2014 TTAB LEXIS 2, at \*18-19 (TTAB 2014). Because fame plays a dominant role in the likelihood of confusion analysis and famous marks are entitled to a wide scope of protection, a plaintiff is obligated to clearly prove the fame of its mark. *Coach Servs.,* 668 F.3d at 1367 (holding that it is the opposer's burden to prove fame of its mark); *Blue Man Prods., Inc. v. Tarmann*, Opp. No. 91154055, 2005 TTAB LEXIS 338, at \*32 (TTAB 2005) (same) *rev'd on other grounds*, slip. op. 05-2037, (D.D.C. Apr. 3, 2008).

Petitioner asserts that its registered Red Top Fence Post Mark is a strong mark in the relevant market, which Petitioner defines as the "agricultural property"

market,[53] pointing to its sales of fence posts bearing the mark for over a "hundred year plus period"[54] and its "evidence of advertising and use of the red color mark" as demonstrating "that it has had widespread exposure in the United States."[55]

Respondent responds to these assertions by arguing that "Petitioner has failed to demonstrate that any 'fame' or 'strength' of its mark extends to a red top on any fence post," while acknowledging "significant evidence surrounding [Petitioner's] long-term sale of 'red-top' products."[56]

Mr. Rakestraw discusses Petitioner's history of marketing and selling its agricultural fence post products featuring the color red "prominently at the top" for over a century.[57] Petitioner participates in trade shows and uses varied marketing

---

[53] Petitioner's brief 82 TTABVUE 35. It appears that Petitioner is asserting niche market commercial strength in the agricultural fencing market. *See ProQuest Info. and Learning Co. v. Island*, Opp. No. 91158016, 2007 TTAB LEXIS 33, at *26 (TTAB 2007) (finding opposer's mark strong based on "widespread recognition and renown of the its mark, particularly among those in the academic, research, and education fields and characterizing this as "niche fame"). *See* Rakestraw declaration, paragraphs 4 and 5, 70 TTABVUE 6, and supported by an advertisement, Exhibit A-08, which states on its face:

> Red Brand is a line of premium agricultural fencing products and reigns as the most recognized brand of farm fence in the United States. The Red Brand logo represents l30 years of making top quality, fence products for a wide variety of applications. Whether you're a full-time farmer or rancher, horse or property owner, Red Brand stands as the product of choice when selecting the best.

*Id*. at 66.

[54] Petitioner's reply brief, 86 TTABVUE 17.

[55] Petitioner's brief, 82 TTABVUE 35.

[56] Respondent's brief, 84 TTABVUE 22. We consider Respondent's statements in its brief that there is "significant evidence" relating to the sales of Petitioner's fence products as too nebulous to be deemed a concession that the Red Top Fence Post Mark is a strong mark. Petitioner's reply brief, 86 TTABVUE 18; Respondent's brief, 84 TTABVUE 22.

[57] Rakestraw declaration, paragraph 5, 70 TTABVUE 6.

and advertising media including internet (website and social media), print, radio, television, and celebrity endorsements to promote its fencing and fence post products which feature red tops.[58] Petitioner advertises the Red Top Fence Post Mark and its other red topped fencing products in conjunction with Petitioner's unpleaded "Red Brand" word mark such as this example shown below.[59]



Petitioner "does not track advertising and marketing expenses at the product level" and has provided combined advertising expenditures for the period of 2011

---

[58] Rakestraw declaration, paragraph 12, 70 TTABVUE 11.

[59] Rakestraw declaration, paragraphs 5, 6, 12, 70 TTABVUE 6, 11. Advertisement embedded in the Rakestraw declaration from Petitioner's website redbrand.com. *Id.* at paragraph 6. As indicated in n.36 *supra*, Petitioner does not plead ownership of a "Red Top" word mark.

through mid-2021 for multiple red topped fence products together: the Red Top Fence Post Mark, related red topped fencing products that feature the color red, and Petitioner's unpleaded "Red Brand" word mark.[60] Therefore, there are no separate advertising figures for the Red Top Fence Post Mark alone.

Petitioner's evidence of advertising and promotion of its fence post product includes "look for" type advertising showing promotion of the red topped portion of its fence post. Mr. Rakestraw testified about one advertisement from the 1950s featuring the "red top" shown below.[61]



---

[60] Rakestraw declaration, paragraph 16, 70 TTABVUE 16.

[61] Rakestraw declaration, paragraph 12, 70 TTABVUE 12.

Also in the record and provided by Mr. Rakestraw is what appears to be a more current undated advertisement that references the red topped portion of Petitioner's fence post, shown below. Mr. Rakestraw describes the advertisement as marketing material, but does not specifically discuss it.



[62]

---

[62] Rakestraw Declaration, Exhibit A-12 (marketing material), 70 TTABVUE 144.

Additional advertisements provided by Mr. Rakestraw as exhibits to his declaration testimony are undated, and described by him as various types of advertising. But, again, the advertisements are not specifically discussed. Many of these advertisements do not include "look for advertising" for the Red Top Fence Post Mark, and the fence post goods are frequently advertised with other red topped fencing products and alongside the unpleaded "Red Brand" word mark. Petitioner's social media and blog post advertising provided under notice of reliance shows on its face that Petitioner promotes all of its products together, often advertising the Red Top Fence Post Mark with Petitioner's unpleaded "Red Brand" word mark and other red topped fencing products, and even advertising them with other non-"Red Brand" or non-red topped products.

The product guide, provided as an exhibit with Mr. Rakestraw's declaration testimony, and shown below, is one example where Petitioner advertises its various fencing products under different marks together.[63]

---

[63] Petitioner's notice of reliance, Exhibits D19, D20, D21, 76 TTABVUE 16-276; Rakestraw declaration, Exhibit A-12 (product guide), 70 TTABVUE 122.



The documentary evidence suggests that in present day advertising, the unpleaded "Red Brand" word mark is generally featured and more prominent than the Red Top Fence Post Mark. Although the "Red Brand" word mark does call

attention to the color red used as a feature on these products, it does not call attention to the Red Top Fence Post Mark, which is displayed as just one of many products, and sometimes, only some of the goods shown have a red-colored top.

As to sales, Petitioner's witness, Timothy Dillon, confidentially provided a combined figure of the number of units sold for six different types of fence posts featuring the red top from 2011 through 2016 (no dollar sales figure provided) and confidentially provided for the separate years 2017, 2018, 2019, 2020, and 2021, separate unit and dollar sales figures[64] for the six different types of fence posts offered featuring a red top.[65] Mr. Dillon also testified that Petitioner offers its fencing products through its website, www.redbrandstore.com, and at over 4,500 retail locations throughout the United States, including various farm supply stores, hardware stores, and building supply stores.[66]

As to Petitioner's advertising figures provided by Mr. Rakestraw, because they are not broken down by product, or by mark, (e.g., Red Top Fence Post Mark, other red topped fence products, and the unpleaded "Red Brand" word mark), we cannot

---

[64] At least some of these figures include Canadian sales, which diminishes the probative value of this evidence.

[65] Dillon declaration, paragraph 5, 72 TTABVUE 6. We note that the sales figures from 2017 through 2021 fluctuate, showing both increases and decreases in those years with no specific upward trend; diminished sales would reflect less consumer exposure.

[66] Mr. Dillon's testimony identified some of the specific retailers: Tractor Supply Company, Lowe's, Home Depot, and Ace Hardware. Dillon declaration, paragraph 4, 72 TTABVUE 6. The accompanying exhibit, submitted confidentially, shows that some of these sales to these national retailers are limited to a specific location, or low in volume. The exhibit also shows many of the other sales appear to be to local retailers, with significant sales to a retailer located in Canada. Thus, the lack of detail and explanation from Mr. Dillon limits the probative value of this testimony.

attribute the advertising figures solely to Petitioner's Red Top Fence Post Mark. We therefore cannot determine the consumer exposure to the Red Top Fence Post Mark alone. In addition, Petitioner's frequent advertising of the Red Top Fence Post Mark with its unpleaded "Red Brand" word mark and other red topped fence products diminishes the significance of Petitioner's advertising evidence in proving the strength of the Red Top Fence Post Mark. *See Promark Brands,* 2015 TTAB LEXIS 67, at *43 ("where a party's advertising and sales data is based on materials and packaging in which the mark at issue is almost always displayed with another mark, such data does not prove that the mark at issue possesses the requisite degree of consumer recognition"). Further, although Mr. Rakestraw generally explained the nature of the advertising, the explanation lacks specifics. For example, there is no testimony about the frequency, extent of distribution or reach of such advertising to provide sufficient context which would allow an inference of exposure to consumers.[67] *See Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 1320 (Fed.

---

[67] The confidential Fed. R. Civ. P. 33(d) documentary evidence relating to Petitioner's advertising from 2011 through 2021 (submitted under Respondent's notice of reliance) suffers because much of it identifies general categories (e.g., internet advertising, print advertising) but does not identify the exact nature of the advertising (magazine, mailer etc.), the reach of the advertising, and the marks under which the fence products are advertised. Respondent's notice of reliance, Exhibit C-2, (confidential), 81 TTABVUE. *See Turdin, Jr. v. Trilobite, Ltd.*, Con. Use. No. 94002505, 2014 TTAB LEXIS 17, at *8 (TTAB 2014) ("However, because the interrogatory response provides virtually no information about the documents, and because Trilobite did not provide context and other information about the documents through testimony, their probative value is limited"); *Kohler Co. v. Baldwin Hardware Corp.*, Can. No. 92041434, 2007 TTAB LEXIS 3, at *5-6 (TTAB 2007) (introduction of documents responsive to interrogatories pursuant to Fed. R. Civ. P. 33(d) permissible under notice of reliance).

Cir. 2018) (contextual evidence needed to arrive at a "proper understanding" of whether customers would recognize the mark).

As to Petitioner's sales figures, the information provided by Mr. Dillon lacks context as to how these sales unit and dollar figures compare with other fence post manufacturers making the information less probative. "Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading." *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1375 (Fed. Cir. 2002). It is difficult to accurately gauge the level of this success in the fence post industry in the absence of additional information, such as Petitioner's market share or how Petitioner's Red Top Fence Post product ranks in terms of sales in the trade. That is, we lack sufficient information as to how these sales numbers compare to other manufacturers of fence posts.[68] *See Mini Melts, Inc. v. Reckitt Benckiser LLC*, Opp. No. 91173963, 2016 TTAB LEXIS 151, at \*58 (TTAB 2016) ("The probative value of this evidence is diminished by the fact that the amount is just a raw number in the vast pharmaceutical industry, providing no context showing Applicant's market share and whether the stated amount of doses sold is significant in the industry.").

---

[68] We do have a confidentially provided total unit and dollar sales figure from Mr. Kovalchick for the period from "2014 to the present," although Respondent stopped selling the fence posts during the course of this litigation. Kovalchick declaration, paragraph 12, 78 TTABVUE; Petitioner's notice of reliance, Respondent's response to request for admission 10-12, 75 TTABVUE. Mr. Kovalchick did not testify as to the separate annual sales information figures Respondent provided in the unsworn interrogatories, which as indicated, are not competent evidence. Respondent's total sales appear greater than Petitioner's total sales (from 2017 through 2021), but the time periods do not completely overlap.

Overall, we lack sufficient context about the advertising as well as comparative advertising and sales numbers of competitors and/or market share percentages for the sale of fence posts. This makes it difficult to make inferences about this indirect evidence.[69] *Bose Corp.,* 293 F.3d at 1375.

Mr. Rakestraw also provided testimony relating to the "history and use" of Petitioner offering to consumers for over one hundred years "red topped individual wire strand fencing, or barbed wire fencing" featuring the color red.[70] *See Bose Corp.,* 293 F.3d at 1376 ("Large market shares of product sales or large percentages of advertising expenditures in a product line would buttress claims to fame."). As reflected by historical advertising in the record, Petitioner "has marketed and sold its agricultural fencing products featuring the color red prominently at the top of its products."[71] Also, in the present day, the evidence shows that Petitioner markets its agricultural fencing featuring the color red under the separate unpleaded "Red Brand" word mark.[72]

Mr. Rakestraw relies on the same advertising figures that are not broken down by product category or mark for fencing products featuring the color red. As discussed, we lack sufficient context for the advertising monies spent. There also is no specific

---

[69] There is no evidence in the record of unsolicited media mentions of the Red Top Fence Post Mark.

[70] Rakestraw declaration, paragraphs 4-5, 10, 14, 70 TTABVUE 6, 12.

[71] Rakestraw declaration, paragraphs 4-5, 10-13, 70 TTABVUE 6.

[72] Rakestraw declaration, paragraphs 5-6, 12-13, 70 TTABVUE 6, 11-12.

information in the record as to the sales of "red topped individual wire strand fencing, or barbed wire fencing" featuring the color red.

We find this evidence based on long use and combined advertising figures with no sales information is insufficient to support a finding of commercial strength of Petitioner's product line of fencing and fence posts featuring the color red.[73] *See Bose Corp.* 293 F.3d at 1375; *Edwards Lifesciences Corp. v. VigiLanz Corp.*, Opp. No. 91154210, 2010 TTAB LEXIS 84, at *31 (TTAB 2009) (opposer's advertising figures were "not particularly impressive" and "the problem that we have in assessing the effectiveness of the advertising expenditures is that there is no testimony or evidence regarding whether opposer's advertising expenditures are large or small vis-à-vis other comparable medical products.").

It is Petitioner's burden to prove fame or commercial strength of a mark. *Coach Servs.,* 668 F.3d at 1367. Although we have over a hundred years of use of the Red Top Fence Post Mark, and wire fencing with a red topped color feature, we lack sufficient evidence of the extent of consumer exposure to or recognition of the Red Top Fence Post Mark or the red topped fencing product line. Long use is not sufficient by itself to prove fame or commercial strength. *Wet Seal Inc. v. FD Mgmt. Inc.*, Opp. No. 91157022, 2007 TTAB LEXIS 21, at *19 (TTAB 2007); *Genesco Inc. v. Martz*, Opp. No. 91121296, 2003 TTAB LEXIS 123, at *35 (TTAB 2003) ("Even accepting that opposer's mark which was registered in 1918 … mere length of time that a mark is

---

[73] There is no evidence in the record of unsolicited media mentions of the fencing product line featuring the color red.

in use does not by itself establish consumer awareness of the mark, such that the mark can be found to be famous.") (*citing General Mills Inc. v. Health Valley Foods*, Opp. No. 91076303, 1992 TTAB LEXIS 37, at *22-23 (TTAB 1992)). We conclude on this record that Petitioner has not established that its Red Top Fence Post Mark or its red topped fencing product line is commercially strong.

Although Petitioner has not established commercial strength, there also is no evidence in the record of third-party registrations or third-party use of the color red, as a single-color mark, for fence post tops. Therefore, we have no evidence to show co-existence of similar marks in the field that demonstrates weakness in the marketplace.

### 3. Conclusion as to Strength of the Mark

While we have no evidence in the record as to the existence of third-party registrations or third-party use for red color marks for fence posts, particularly red color marks for fence post tops, that would affect the commercial strength of Petitioner's Red Top Fence Post mark, we also have insufficient evidence in the record of commercial strength or fame.[74] These findings counterbalance each other as we

---

[74] Numerous third-party uses or registrations of red color marks for fence posts would affect the scope of protection. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection."). The common use as a mark of a particular color in a particular field would show customers are accustomed to distinguishing between color marks based on color and particularly subtle differences in color, while a lack of such evidence would indicate that the color mark is unique or at least not coexisting with other marks in the field. *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *22-23.

have no evidence or insufficient evidence to expand or contract the scope of the protection to which Petitioner's Red Top Fence Post mark is entitled.

On the other hand, Petitioner's Red Top Fence Post Mark is conceptually weak due to its nature—color applied to a portion of its fence post product.

Given the Red Top Fence Post Mark's conceptual weakness and lack of sufficient record evidence that the Red Top Fence Post Mark is commercially strong, we conclude that Petitioner's mark is entitled to a narrow scope of protection. Nonetheless, such protection is broad enough to protect from registration of a confusingly similar mark for identical or related goods. *See King Candy Co.*, 496 F.2d at 1401 (likelihood of confusion is to be avoided as much between weak marks as between strong marks); *In re Colonial Stores, Inc.*, Ser. No. 209079, 1982 TTAB LEXIS 116, at *7-8 (TTAB 1982)[75] ("likelihood of confusion, mistake or deception is to be avoided as much between weak marks as between strong marks").

We find the fifth and sixth *DuPont* factors are neutral.

### D.  Similarity or Dissimilarity of the Parties' Marks

We now turn to the first *DuPont* factor, "similarity or dissimilarity of the marks." *DuPont*, 476 F.2d at 1361.

Color marks, by their nature, do not lend themselves to the sort of comparison that is possible in the case of word marks, whose similarity or dissimilarity in appearance can be analyzed and articulated based on objective factors. When the

---

[75] Complete serial number unavailable.

marks at issue are color marks, the similarity of the marks must be decided primarily on the basis of visual similarity, which has been described as a "subjective eyeball test." *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *12-13 (citing *General Foods Corp. v. Ito Yokado Co.*, Opp. No. 91063721, 1983 TTAB LEXIS 70, at *16 (TTAB 1983)); *see also In re Medline Indus., Inc.*, Ser. No. 87680078, 2020 TTAB LEXIS 16, at *40 (TTAB 2020) (discussing comparison of color marks) (citing cases and treatise). *Cf. Volkswagenwerk AG v. Rose'vear Enters., Inc.*, 592 F.2d 1180, 1183 (CCPA 1979) (the similarity of two design-only marks is "decided primarily on the basis of [their] visual similarity" and "is a subjective determination") (citations omitted).

"[W]hen comparing the color marks at issue, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison," but "rather whether the marks are sufficiently similar in terms of their appearance and overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result." *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496 at *13 (citation omitted). "The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks." *Inter IKEA Systems B.V. v. Akea, LLC*, Opp. No. 91196527, 2014 TTAB LEXIS 166, at *17-18 (TTAB 2014) (citations omitted); *see also Volkswagenwerk AG*, 592 F.2d at 1183 (the determination "must take into account the commercial impressions of the marks on *casual purchasers*") (emphasis in original).

We keep in mind that "[w]hen marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992).

### 1. Defining the Marks

In analyzing the marks, we of course must compare them as they appear in the drawings. *See* Trademark Rule 2.52, 37 C.F.R. § 2.52 ("A drawing depicts the mark sought to be registered."). The record also includes descriptions of Petitioner's and Respondent's marks, and we consider them as well. *See In re Medline Indus., Inc.*, 2020 TTAB LEXIS 16, at *37 ("because the drawings of the marks at issue here show the particular shades of green and both descriptions [of the marks] use Pantone designations to identify a specific shade of green, in comparing the claimed marks, we cannot simply read one color claim to encompass the other claimed color"); *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *18-19 (considering the description of the marks describing Registrant's mark as lined for the color blue and consisting of the color blue and Applicant's mark, a color drawing, described as "a translucent, iridescent teal color."). But if there is any inconsistency between the drawing and the color claimed in the description, the drawing controls. *See In re Medline Indus., Inc.*, 2020 TTAB LEXIS 16, at *37 n.36 (citing by analogy TMEP § 807.07(a)(1)); *see also In re Water Gremlin Co.*, 635 F.2d 841, 843, (CCPA 1980) (evaluating design based on drawing, not on appellant's characterization of the design); *In re Change Wind Corp.,* Ser. No. 86046590, 2017 TTAB LEXIS 233, at *15 n.6 (TTAB 2017) ("the

drawing of the mark, not the words an applicant uses to describe it, controls what the mark is") (citations omitted).

Petitioner's Red Top Fence Post Mark includes a color statement that reflects the color red applied to the top of the fence post drawing with a disclaimer of the fence post itself.[76] Respondent's Red, White and Blue Fence Post Mark is a color drawing and includes a color claim of the colors, red, white, and blue, with the application of the color to the mark described as "a blue bottom, white middle, and red top." [77] Respondent makes no claim to the fence post itself.

---

[76] Prior to November 2, 2003, the USPTO did not accept color drawings. TMEP § 1902.02(e) (Note). An applicant who wanted to show color in a mark was required to submit a black-and-white drawing with a statement identifying the color(s) and describing where it/they appeared in the mark or submit a drawing that was lined for color. *Id*.

[77] After November 2, 2003, the USPTO accepted color drawings accompanied by: (1) a claim naming the color(s) that are a feature of the mark; and a statement naming the color(s) and describing where the color(s) appear on the mark. Trademark Rules 2.37 and 2.52(b)(1), 37 CFR §§ 2.37 and 2.52(b). In order to comply with Trademark Rule 2.52(b)(1) the USPTO requires as follows with respect to descriptions of color marks:

> The color claim must include the generic name of the color(s) claimed. It is usually not necessary to indicate shades of a color, but the examining attorney has the discretion to require that the applicant do so, if necessary to accurately describe the mark. The color claim may also include a reference to a commercial color identification system. TMEP §807.07(a)(i).

> The description of the mark must be clear and specific, use ordinary language, and identify the mark as consisting of the particular color as applied to the goods or services. If the color is applied only to a portion of the goods, the description must indicate the specific portion. Similarly, if the mark includes gradations of color, the description should so indicate. If the applicant is claiming a shade of color, the shade must be described in ordinary language, for example, "maroon," "turquoise," "navy blue," "reddish orange." This is required even if the applicant also describes the color using a commercial coloring system. TMEP § 1202.05(e).

Petitioner's pleaded Red Top Fence Post Mark is presumed to encompass any shade of red because the drawing is lined for the color red. *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *19 (where the mark was lined for the color blue, registrant's "'blue' mark is not limited to a certain shade of blue and thus covers all shades of blue, including greenish blue"; applicant's mark was a color drawing and the color teal was claimed); *Amsted Indus. Inc. v. W. Coast Wire Rope & Rigging Inc.*, Opp. No. 91070015, 1987 TTAB LEXIS 69, at *15 (TTAB 1987) (with respect to drawings lined for color, "there is no provision in our [trademark] rules for indicating particular color shades or hues"; lining in opposer's mark includes all shades of yellow) (citing *Youngstown Sheet & Tube Co. v. Mo. Rolling Mill Corp.*, 1962 TTAB LEXIS 58, at *5 (TTAB 1962)).[78] On the other hand, Respondent's Red, White and Blue Fence Post Mark, is controlled by the drawing page displaying the multi-color mark; the shades of color covered for the color combination red, white and blue are that shown in the color drawing. *In re Medline Indus., Inc.*, 2020 TTAB LEXIS 16, at *37, *39 & nn.36 & 38 ("we note, in any event, that the drawing page controls and the only shade of green covered by the registration is that shown in the color drawing"; where two color drawing marks are compared, "we thus must compare the shades as they appear in the respective drawings, not as they are described").

We may also consider the placement of the color marks. *See In re Medline Indus., Inc.*, 2020 TTAB LEXIS 16, at *43 ("the claimed marks here are not used on only one part of the goods. … the respective drawings show that both marks cover the entire

---

[78] Proceeding number unavailable.

surface of the goods."); *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *19 ("The colors run the length of the products, which are narrow in shape."). Here, Respondent's color mark covers the entire length of the fence post, with the colors in different proportions; from bottom to top, the color blue covers the largest portion of the fence post, with the colors white and red proportionally smaller (the color white is approximately twice the size of the color red, and approximately one quarter the size of the color blue). Petitioner's red color mark covers only the top portion of the fence post.

We also can "take into account the conditions surrounding the marks' exposure to consumers, including 'replicating, if necessary, lighting conditions under which a colored product is normally sold.'" *In re Medline Indus., Inc.*, 2020 TTAB LEXIS 16, at *43-44 ("The gloves are frequently exposed, both at the point of sale of the goods and post-sale while in use, in a manner that make their surfaces clearly visible, and the resulting prominence of the claimed marks reduces the risk that lighting conditions or other factors may affect the ability of consumers to distinguish between the respective shades of green") (quoting *Qualitex Co.*, 514 U.S. at 167 and discussing *In re Cook Med. Techs.*, 2012 TTAB LEXIS 496, at *19 & n.4 (referencing the Board's consideration of lighting conditions and the color as applied to the goods where the Board stated "the translucence [of the applicant's teal mark] may not be perceptible and the iridescence may result in the teal being perceived as more blue than green")).

In this case, we do not consider lighting conditions because the expert testimony was limited to consumers' color perception of the color red, and not the entirety of

Respondent's Red, White and Blue Fence Post Mark.[79] We also find, based on the advertising material and the most common manner of their display, concerns regarding lighting visibility of the marks are not present in this case. We note that the advertising material submitted by the parties shows that consumers are exposed to the entirety of the fence posts, their colored surfaces are visible, and the posts are at least several feet in height.



[80]

---

[79] Mr. Flombaum states: "I have been asked to supply an opinion on consumer perception of the shading of red used on the defendant's metal fence post product." Flombaum declaration, paragraph 1, 74 TTABVUE 4. Respondent submitted website evidence relating "to color/ color schemes and their effect on individual and/or consumer psychology" to counter this expert testimony, Respondent's notice of reliance, Exhibits H1-H5, 80 TTABVUE 5-6, 769-806, but this evidence is hearsay, because it is unaccompanied by any witness testimony. *See Shenzhen IVPS Tech. Co.*, 2022 TTAB LEXIS 383, at \*64 (news articles provided under notice of reliance hearsay); *Calypso Tech., Inc. v. Calypso Cap. Mgmt., LP*, Opp. No. 91184576, 2011 TTAB LEXIS 259, at \*21 (TTAB 2011) ("In particular, with respect to articles and other material published on websites or in publications, we have considered them only for the fact that they have been published and may have been viewed, but not for the truth of the statements made in them.").

[80] Respondent's notice of reliance Exhibit D-1 (Facebook post), 80 TTABVUE 381.



2. The Parties' Arguments

Petitioner argues that the "dominant feature of … both marks is the red, top portion[,] of the metal fence post, and consumers recognize the top color of fence posts as a source identifier."[82] In particular, Petitioner contends that "the relevant public associates [with Petitioner] a particular color (red) in a particular location on [sic] fence post (the top)" and that Respondent's Red, White and Blue Fence Post Mark adopts "the dominant feature of the Red Top Fence Post Mark by using the exact same color in the exact same prominent location on the exact same goods."[83]

---

[81] Rakestraw declaration, Exhibit A-12 (marketing material), 70 TTABVUE 123.

[82] Petitioner's brief, 82 TTABVUE 32.

[83] Petitioner's reply brief, 86 TTABVUE 7.

Petitioner argues that "in the fencing industry, manufacturers use coloring on the top of products as a source identifier as evidenced by Franklin's and Petitioner's commercial products."[84] Petitioner also argues that both marks include a color claim for the color red of no specific shade.[85] Petitioner submits that both parties' color marks have the same commercial impression.[86]

Respondent counters that Petitioner "fails to compare its Red Mark to Registrant's 'red, white and blue' Mark as a whole," and improperly ignores the white and blue portion of Respondent's mark by focusing "only on the red top aspect."[87] Respondent asserts that Petitioner's arguments relating to similarity of the marks is conclusory and that its position that "red" is the dominant feature of Respondent's Red, White and Blue Fence Post Mark is unsupported.[88] Respondent asserts that the color red is a small portion of its Red, White and Blue Fence Post Mark and can hardly be considered dominant, and that the parties' marks have different commercial impressions.[89] In particular, Respondent argues:

> as a whole Registrant's "red, white and blue" Mark conveys the overall commercial impression of America and patriotism, given the whole color combination red, white and blue, and the well-established significance that red, white and blue as a color combination has in the United States.

---

[84] Petitioner's brief, 82 TTABVUE 30, 36.

[85] Petitioner's brief, 82 TTABVUE 31. As already discussed *supra*, Respondent's multi-color mark actually is limited to the specific shades of colors as shown in the drawing.

[86] Petitioner's brief, 82 TTABVUE 32.

[87] Respondent's brief, 84 TTABVUE 16.

[88] Respondent's brief, 84 TTABVUE 16.

[89] Respondent's brief, 84 TTABVUE 16.

… The American consuming public readily recognizes the red, white and blue color combination as distinct from red only color presentations.[90]

Respondent submits that "the public expects a 'red top' on Petitioner's gray or metallic goods[91] – not multi-color product themes, let alone a red, white and blue patriotic one," and that "extending Petitioner's registration to cover all variations of a 'red top' on a fence post, no matter the overall connotation of the other elements of the fence post at issue, would result in Petitioner being awarded a scope of protection that extends well beyond" what it is entitled.[92]

### 3. Comparing the Marks

Respondent's Red, White and Blue Fence Post Mark is the claimed combination of the colors red, white and blue; thus, the commercial impression is engendered by the use of all three colors and not just the color red. In comparing the parties' marks, the proper analysis requires us to consider the visual similarity and commercial impression of Respondent's Red, White and Blue Fence Post Mark as a whole, and not just the "red top" portion of Respondent's mark as Petitioner contends.[93] *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015) (Board erred in in analyzing the similarity of the three-word combination PEACE LOVE AND

---

[90] Respondent's brief, 84 TTABVUE 16.

[91] Respondent states it "does not challenge that conclusion, [from Petitioner] because it does not need to do so to prevail." Respondent's brief, 84 TTABVUE 23.

[92] Respondent's brief, 84 TTABVUE 19.

[93] Petitioner did not submit any evidence that persuades us that the color red is dominant in Respondent's Red, White and Blue Fence Post Mark. *See Amsted Indus. Inc. v. W. Coast Wire Rope & Rigging Inc.*, 1987 TTAB LEXIS 69, at *18 ("Whereas opposer may consider yellow to be dominant as compared to green there is no objective evidence that this is the fact in the record before us and the argument seems only to be based a natural bias of opposer that, since it uses yellow, yellow must be the most noticeable color in any other setting.").

JUICE with the two-word combination PEACE & LOVE by comparing "PEACE LOVE" (as the "dominant" portion of the three-word combination) with PEACE & LOVE without considering "how the three-word phrase" PEACE LOVE AND JUICE "may convey a distinct meaning—including by having different connotations in consumers' minds—from the two-word phrase" PEACE & LOVE); *Rockwood Chocolate Co. v. Hoffman Candy Co.*, 372 F.2d 552, 555 (CCPA 1967) ("each case requires consideration of the effect of the entire mark including any term in addition to that which closely resembles the opposing mark"; entire marks considered on basis of confusing similarity); *Federal Bureau of Investigation v. Societe: "M. Bril & Co."*, Ser. No. 72287174, 1971 TTAB LEXIS 292, at *18 (TTAB 1971) (in considering similarity of the marks, we must assume that purchasers will encounter the unitary mark F.B.I. Fabrication Bril International as a whole on the garments rather than F.B.I. alone; the commercial impression is created by the mark as a whole).

Petitioner supports its arguments regarding the fence post top being a source indicator and the dominant portion of the parties' marks with advertisements in the record for Petitioner's and Respondent's fence posts.[94]

---

[94] Petitioner's brief, 82 TTABVUE 32. Respondent's notice of reliance, Exhibit B-2, 80 TTABVUE 209. According to the statement in the notice of reliance, this mark is owned by an affiliate of Respondent's. Respondent's notice of reliance 80 TTABVUE 2; Rakestraw declaration, Exhibit A-11, 70 TTABVUE 120.



Although Petitioner's and Respondent's use of color applied to the top of fence posts as source indicators is some evidence of industry practice of use of color as a trademark rather than a decorative feature of the goods, it is limited because it does not include evidence of other competitors' use,[95] and there is no testimony or evidence in the record that Petitioner and Respondent control 100 percent of the market. As a

---

[95] Petitioner also argues industry practice based on case law, citing *In re Pollak Steel Co.*, 314 F.2d 566, 568 (CCPA 1963) (affidavits provided that stated in the fence post business it had become customary to identify the producers by color on the tops of the posts). Petitioner's reply brief, 86 TTABVUE 7. Prior decisions in trademark cases, however, are of little help in deciding cases involving different marks and different facts. We are assessing registrability today, and what was considered industry practice sixty years ago may have changed. "Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 1199 (CCPA 1973).

result, we cannot conclude based on this record that consumers would treat the red portion of Respondent's mark as the dominant portion of the color mark, and we will not employ a per se rule. [96] Therefore, we consider Respondent's multi-color mark in its entirety in our comparison of the marks, and do not discount any colored portion of the mark.

### a. Visual and Commercial impression of Petitioner's and Respondent's marks

In visual appearance, Petitioner's mark is a single color—red—applied to a fence post top, while Respondent's mark is the combination of the colors red, white and blue applied to a fence post in its entirety. The color marks are visually similar to the extent that Petitioner's registration is lined for the color red and covers all shades of the color red, including the shade of red used at the top of the fence post in Respondent's multi-color mark. But the marks also are visually dissimilar because Respondent's mark is a multi-color mark that also uses the colors white and blue applied to the remainder of the fence post.

The commercial impression of Petitioner's Red Top Fence Post Mark, is a "red top," and the color red.

---

[96] As previously mentioned, Mr. Flombaum's expert opinion was based on whether consumers would distinguish between Petitioner's and Respondent's two fence posts solely on the basis of a red coloring applied to the top of each product; his opinion did not consider the other colors in Respondent's mark. Flombaum declaration, 74 TTABVUE. Mr. Flombaum's opinion indicates that human perception of color is inconstant and hazy as to hue and could result in misperception of the shade of red applied to each product. Flombaum declaration, paragraph 18, 74 TTABVUE. However, the opinion is not probative of consumers' perception of Respondent's multi-color mark as a whole.

As to Respondent's mark, we find the visual impact of the color combination red, white and blue in Respondent's Red, White and Blue Fence Post Mark creates a single commercial impression. *Cf. In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 1571 (Fed. Cir. 1988) (the three elements of the background–the dropper, the droplet, and the watering can–are interrelated elements of a single unified design and cannot be registered separately); *In re E. J. Brach & Sons*, 256 F.2d 325, 328 (CCPA 1958) (where the background material plus the word marks so blend together that they are inherently incapable of creating more than a single commercial impression, and non-distinctive background not separately registrable).

A consumer encountering Respondent's Red, White and Blue Fence Post Mark in the marketplace would understand the mark as a whole to refer to the national colors of the United States of America, or the flag of the United States of America. *See T. W. Samuels Distillery, Inc. v. Schenley Distillers, Inc.*, 458 F.2d 1403, 1404 (CCPA 1972). (By "commercial impression" we mean "what the probable impact will be on the ordinary purchaser in the market place ….").

Our finding as to the single commercial impression of Respondent's Red, White and Blue Fence Post Mark is consistent with Respondent's advertisements that are in the record. *See Specialty Brands, Inc. v. Coffee Bean Distribs, Inc.*, 748 F.2d 669, 674 (Fed. Cir. 1984) ("trade dress may nevertheless provide evidence of whether the word mark projects a confusingly similar commercial impression")*; N. Face Apparel Corp.*, Opp. No. 91187593, 2015 TTAB LEXIS 328, at *27 (TTAB 2015) (with respect to the connotation and commercial impression of the marks, the Board considered

opposers' advertising that may result in recognition by the consumer of its design element not just as an abstract "S" but also an abstract design of a mountain peak); *see also Am. Rice, Inc. v. H.I.T. Corp.,* Opp. No. 91067497, 1986 TTAB LEXIS 35, at *13-14 (TTAB 1986) ("we may take into account whether the trade dress of packages or labels in the application file as specimens, or otherwise in evidence, may demonstrate that the trademark projects a confusingly similar commercial impression."); *Nw. Golf Co. v. Acushnet Co.,* Opp. No. 91066474, 1985 TTAB LEXIS 86, at *15 (TTAB 1985) ("Evidence of the context in which a particular mark is used on labels, packaging, etc., or in advertising is probative of the significance which the mark is likely to project to purchasers.").

Respondent's Facebook post and advertisements include the following:



[97]

---

[97] Respondent's notice of reliance, Exhibit D-4, (Facebook "Patriot Posts") 80 TTABVUE 385.



# FRANKLIN IND. ROLLS OUT THE NEW RED WHITE & BLUE POST™



Inspired by the resurgence of American manufacturing, we celebrated by creating Red White & Blue Post™.

Our Red White & Blue posts are for any proud American property owner to show their national spirit for their farm, garden or any other property.

Made with the same quality rail steel as all of our posts, the Red White & Blue Posts™ boasts a three-color baked enamel finish that matches its name.

Get yours today!

[98]

---

[98] Kovalchick declaration, Exhibit 1, 78 TTABVUE 14.



99

Overall, the marks are dissimilar in appearance. When we visually compare the marks in their entireties, we cannot agree with Petitioner's contention that the presence of the color red in both marks suffices to make the marks similar. Instead, we find that the parties' marks evoke different commercial impressions which results from the additional colors in Respondent's mark. Even if the red portion of Respondent's Red, White, and Blue Fence Post Mark is considered visually the same color red by consumers as the color red in Petitioner's Red Top Fence Post Mark, we find that consumers encountering the parties' marks are not likely to perceive Petitioner's Red Top Fence Post Mark and Respondent's Red, White and Blue Fence Post Mark as the same or similar. Consumers will perceive Respondent's three-color mark in its entirety as creating a different commercial impression than Petitioner's single-color mark which is the color red alone.

---

[99] Respondent's notice of reliance, Exhibit D-1, 80 TTABVUE 379.

In view of the foregoing, we find the claimed color marks are distinct and dissimilar. *See Truescents LLC v. Ride Skin Care, L.L.C.*, Opp. No. 91158556, 2006 TTAB LEXIS 477, at *25 (TTAB 2006) ("nowithstanding identical and related goods" the Board found that although there was a point of similarity in applicant's and opposer's marks, this similarity was "not sufficient to overcome the basic dissimilarity between the marks").

The first *DuPont* factor weighs against a finding of likelihood of confusion.

### E. Absence of Actual Confusion

Under the seventh and eighth *DuPont* factors, we consider the nature and extent of any actual confusion in light of the length of time and conditions under which there has been contemporaneous use of Petitioner's and Respondent's color marks. *DuPont*, 476 F.2d at 1361. The seventh and eighth *DuPont* factors are interrelated; the absence of evidence of actual confusion, under the seventh *DuPont* factor, by itself is entitled to little weight in our likelihood of confusion analysis unless there also is evidence, under the eighth *DuPont* factor, that there has been a significant opportunity for actual confusion to have occurred. *See In re Cont'l Graphics Corp.*, Ser. No. 75033628, 1999 TTAB LEXIS 500, at *9 (TTAB 1999); *Gillette Can. Inc. v. Ranir Corp.*, Opp. No. 91082769, 1992 TTAB LEXIS 24, at *19 (TTAB 1992). Under the eighth *DuPont* factor, we "look at actual market conditions, to the extent there is evidence of such conditions of record." *See In re Guild Mortg. Co.*, Ser. No. 86709944, 2020 TTAB LEXIS 17, at *19 (TTAB 2020).

Respondent's witness testified that he is not aware of any confusion between the parties' marks, and that "prior to the filing of the cancellation petition, no notification of actual instances of confusion were received by Franklin from Keystone or Chicago Heights Steel."[100]

Petitioner concedes that there has been no submission of evidence of actual confusion in this case,[101] but submits that there has been limited opportunity for confusion, relying on the evidence in the record of Respondent's confidential sales volume between 2014 through 2018.[102] Petitioner also points out that Respondent stopped selling the fence post product in 2019, due to the parties' litigation.[103]

As to promotional expenses, there is no competent evidence in the record, and Respondent did not provide witness testimony on this point showing appreciable advertising that would be probative to a finding of no actual confusion.[104] *See, e.g.*, *Sales Analysis Inst., Inc. v. Sales Training, Inc.*, Opp. No. 91052147, 1973 TTAB LEXIS 313, at *15-16 (TTAB 1973) (overlapping services offered concurrently and nationwide to the same potential consumers and extensively advertised through radio, television, business publications and local newspapers for sixteen years supported a finding of no actual confusion since the "conditions and circumstances

---

[100] Nathan Kovalchick declaration, paragraph 19, 79 TTABVUE 10.

[101] Petitioner's reply brief, 86 TTABVUE 19.

[102] Petitioner's reply brief, 86 TTABVUE 19.

[103] Petitioner's reply brief, 86 TTABVUE 19; Respondent's brief, 84 TTABVUE 27; Petitioner's notice of reliance, Respondent's response to requests for admission 10-12, 75 TTABVUE.

[104] *See supra* n.32 regarding unsworn interrogatories.

appear to have been such that if confusion were likely to occur, it would have occurred over this length of time").

We also do not have testimony or competent evidence about the actual market and distribution channels, and we lack testimony from the parties' witnesses as to whether there is sufficient overlap geographically of the actual marketing and distribution channels such that we could infer that there has been a reasonable opportunity for confusion to occur. *See In re Guild Mortg.*, 2020 TTAB LEXIS 17, at *25 ("there is a lack of evidence that in the actual marketplace, the same consumers have been exposed to both marks for the respective services, such that we could make a finding as to the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion"); *Time Warner Enter. Co. v. Jones*, Opp. No. 91112409, 2002 TTAB LEXIS 462, at *35-36 (TTAB 2002) (although parties used their marks concurrently for over thirteen years "we cannot conclude that applicant's sales and advertising of her maps have been so substantial that the absence of actual confusion is surprising or legally significant"); *Nordica di Franco e Giovanni Vaccari & C. s.a.s. v. Nordic Sport Ltd. AB*, Opp. No. 91058199, 1979 TTAB LEXIS 30, at *11 (TTAB 1979) (lack of evidence of actual confusion is not significant in view of the relatively short time of the coexistence of both marks in the marketplace, and also in view of the limited sales of applicant's goods as evidenced by the record).

Because of the more limited nature of Respondent's activities (e.g., sales activities for a limited period and cessation of sales activities of the fence post goods pending

this litigation), we find the evidence of concurrent use based on actual market conditions does not indicate a significant opportunity for confusion to occur. *See, e.g.*, *Lebanon Seaboard Corp. v. R & R Turf Supply, Inc.*, Opp. No. 91197241, 2012 TTAB LEXIS 29, at *26-27 (TTAB 2012) (concurrent use did not support no actual confusion because of limited period of concurrent use and limited advertising and sales); *Kraft, Inc. v. Country Club Food Indus., Inc.*, Can. No. 92013549, 1986 TTAB LEXIS 84, at *11 (TTAB 1986) (limited opportunity for evidence of actual confusion in view of limited scope of registrant's distribution and the relatively small promotional effort put forth on behalf of registrant's goods).

We find the seventh and eighth *DuPont* factors are neutral.

### F. Laches Attributable to Owner of Prior Mark and Indicative of Lack of Confusion

For the tenth *DuPont* factor, which deals generally with "the market interface between [respondent] and the owner of a prior mark," Respondent focuses on subsection 10(d), "laches and estoppel attributable to owner of prior mark and indicative of lack of confusion." *DuPont*, 476 F.2d at 1361; *see In re Opus One Inc.*, Ser. No. 75722593, 2001 TTAB LEXIS 707, at *33-34 (TTAB 2001) (under 10(d) of the tenth *DuPont* factor, laches and estoppel may be "indicative of a lack of confusion," to the extent that it shows that a registrant believes that confusion is not likely to result from applicant's use of the mark applicant seeks to register); *see, e.g.*, *In re Wilson*, Ser. No. 75285881, 2001 TTAB LEXIS 53, at *14-15 (TTAB 2001) (finding tenth *DuPont* factor under 10(d) relating to laches and estoppel neutral "where evidentiary record does not support applicant's contention that registrant, when it filed its

application in 1925, was aware of Highland Orange Association's PINE CONE label, much less that registrant's filing of the application in 1925 operates as an estoppel or otherwise is evidence that registrant believed that confusion was unlikely.") In this case, Respondent argues laches, but not estoppel, under *DuPont* factor 10(d).

We find the evidentiary record in this case as previously discussed in connection with Respondent's laches affirmative defense does not support Respondent's contention that Petitioner was aware of Respondent's registration when it issued on April 30, 2013 on the Supplemental Register. Nor is there evidence establishing that Petitioner's lack of contact with Respondent after its Red, White and Blue Fence Post Mark registered and its lack of action towards Respondent's registration prior to May 30, 2017 was because Petitioner assumed or believed that confusion was unlikely to result (as such facts, if proven, would weigh against a finding of likelihood of confusion in this case).

We find the tenth *DuPont* factor is neutral.

G. Any Other Established Fact Probative of the Effect of Use

The thirteenth *DuPont* factor examines "any other established fact probative of the effect of use." *DuPont*, 476 F.2d at 1361.

Petitioner argues that Respondent registered its Red, White and Blue Fence Post Mark "despite knowing about Keystone's Red Top Fence Post Mark and registration" and despite "also knowing about the significance of color on the top of fence products

as a source identifier, …. [i]n the fencing industry."[105] Petitioner submits that Respondent knows "about the significance of color on the top of fence products as a source identifier" as "evidenced by Franklin's and Petitioner's commercial products which include colored tops on fence post[s]" (i.e., Petitioner's use of the color red and Respondent's use of the color yellow on fence post tops), *see* discussion *supra*.[106] Respondent counters that Petitioner has failed to meet its burden on this issue because awareness or knowledge of Petitioner's Red Top Fence Post Mark is not evidence of intent to confuse, and Petitioner's mention that Respondent offers other fence posts with a yellow top is "hardly indicative of an industry as a whole."[107]

Bad faith, or intent to confuse, falls under the thirteenth *DuPont* factor. *L.C. Licensing Inc. v. Berman*, Opp. No. 91162330, 2008 TTAB LEXIS 756, at *20 (TTAB 2008). An inference of bad faith "requires something more than mere knowledge of a prior similar mark." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed. Cir. 1987) (awareness of plaintiff's mark through trademark search and opinion of counsel that the mark was available notwithstanding plaintiff's mark was not sufficient for an inference of bad faith). A finding of bad faith must be supported by evidence of an intent to confuse, rather than mere knowledge of another's mark or even an intent to copy. *See, e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) ("[T]he 'only relevant intent is intent to confuse. There is

---

[105] Petitioner's brief, 82 TTABVUE 36 (referencing Petitioner's notice of reliance, Respondent's response to request for admission no. 28, 75 TTABVUE).

[106] Petitioner's brief, 82 TTABVUE 35-36.

[107] Respondent's brief, 84 TTABVUE 26.

a considerable difference between an intent to copy and an intent to deceive.'") (citation omitted).

We find that Respondent's knowledge of Petitioner's Red Top Fence Post Mark, and Respondent's use of a separate mark comprising the color yellow on fence post tops, is not enough to constitute bad faith. As indicated, no testimony was provided by the parties as to third parties in the industry applying color to fence posts or fence post tops as trademarks, or that Petitioner and Respondent control 100 percent of the market such that Petitioner's and Respondent's use of color on fence post tops in this manner is indicative of the fence industry as a whole. Therefore, because we know nothing more about the industry other than Petitioner's and Respondent's use of color as marks on fence post tops, Petitioner's assertions related to third-party industry practice as to use of color as marks on fence posts are merely attorney argument. *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

Petitioner has not shown based on the evidence of record that Respondent intentionally sought to trade on Petitioner's goodwill by coloring the top of its fence post red in combination with the colors white and blue. This lack of evidence is unsurprising in view of our finding that a consumer encountering Respondent's Red, White and Blue Fence Post Mark in the marketplace would understand the mark as a whole to refer to the national colors of the United States of America, or the flag of the United States of America and not to Petitioner's Red Top Fence Post Mark.

Petitioner also argues that Respondent acted in bad faith when it submitted its Section 8 declaration of use (filed on April 29, 2019) because Respondent has admitted that it did not use the mark in 2019, 2020, and 2021.[108] Respondent counters that there is a lack of bad faith since "cessation of sales was due to Registrant's desire to demonstrate good faith cooperation with Petitioner in resolving this matter" and that Respondent was waiting to resume manufacturing when this matter is resolved.[109]

Respondent's 2019 Section 8 declaration of use did indicate continued use of its fence post product under the involved mark. But Respondent's April 23, 2023 combined Section 8 declaration of excusable nonuse and Section 9 renewal application makes reference to the present cancellation proceeding and Respondent's agreement not to sell its fence post product displaying the colors red, white and blue until a determination in this case is made.

We find that Respondent's interrupted use of its Red, White and Blue Fence Post Mark does not reflect bad faith in filing the Section 8 declaration of continued use, or the combined Section 8/9 declaration of excusable nonuse and application for renewal, particularly when the basis for the excusable nonuse is the parties' litigation. Respondent has explained its nonuse in its most recent filing with the USPTO, and

---

[108] Petitioner's brief, 82 TTABVUE 37 (referencing Petitioner's notice of reliance, 75 TTABVUE, Respondent's responses to request for admission 10-12 and Respondent's Section 8 declaration of use, 75 TTABVUE 1018-24).

[109] Respondent's brief, 84 TTABVUE 27, (referencing Petitioner's notice of reliance, Respondent's response to request for admission 10-12, 75 TTABVUE). Respondent states in its brief, 84 TTABVUE 27, that "Petitioner has cited to no evidence and nothing is in the record suggesting retailers or wholesalers had no inventory of Registrant's Patriot Posts, or were not otherwise selling through inventory in 2019."

has engaged in "vigorous efforts" to defend itself in this case, by filing testimony, other evidence, and a brief. *See Penthouse Int'l. Ltd. v. Dyn Elecs., Inc.*, Opp. No. 91055448, 1977 TTAB LEXIS 72, at *17 (TTAB 1977) ("nonuse of a mark pending the outcome of litigation to determine the right to such use or pending the outcome of a party's protest to such use constitutes excusable nonuse sufficient to overcome any inference of abandonment.").

We find the thirteenth *DuPont* factor is neutral.

## VIII. Conclusion

When we consider and weigh the evidence of record and the relevant likelihood of confusion factors, *In re Charger Ventures LLC*, 64 F.4th 1375, 1381 (Fed. Cir. 2023), we conclude that confusion is unlikely.

The relatedness of the goods, channels of trade, and class of consumers weigh in favor of a likelihood of confusion. The conditions of sale and the fifth, sixth, seventh, eighth, tenth, and thirteenth *DuPont* factors are neutral. The conceptual weakness implicates only similar marks, but here the dissimilarity of the marks weighs heavily against likelihood of confusion.

Although as noted, the degree of similarity between the marks which is required to support a finding of likelihood of confusion is less than it would be if the goods were not identical, we find that the parties' marks are distinct and dissimilar. The point of similarity between the marks is not sufficient to overcome the basic dissimilarity in appearance and commercial impression when Respondent's and Petitioner's marks are considered and compared in their entireties.

In this case, the dissimilarity of the marks is the most important and pivotal factor, outweighing the other *DuPont* factors. *See Kellogg Co. v. Pack-Em Enters. Inc.*, 951 F.2d 330, 333 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispostive. ... 'each [of the thirteen elements] may from case to case play a dominant role.'"); *see also Quiktrip West, Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1037 (Fed. Cir. 2021); *Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, 826 F.3d 1376, 1381-82 (Fed. Cir. 2016); *Odom's Tennessee Pride Sausage, Inc. v. FF Acquisition, LLC*, 600 F.3d 1343, 1346-47 (Fed. Cir. 2010); *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1375 (Fed. Cir. 1998).

.

Accordingly, we find that Respondent's Red White and Blue Fence Post Mark is not likely to cause confusion with Petitioner's Red Top Fence Post Mark.

**Decision:**

Cancellation No. 92066927 on the ground of likelihood of confusion is denied.

As noted herein, Petitioner is allowed until **thirty (30) days** from the mailing date of this decision to submit and serve on Respondent a redacted version of the notice of reliance with respect to certain confidential exhibits, failing which, these exhibits will be treated in their entirety as part of the public record.